COURT OF APPEALS OF VIRGINIA

Present: Judges Benton, Coleman and Elder
Argued at Richmond, Virginia


EUGENIE STERLING TROTTER

MEMORANDUM OPINION[*] BY
v.          Record No. 1707-96-2          JUDGE LARRY G. ELDER
                                                    AUGUST 5, 1997
JOHN C. MAXWELL, JR.


FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
Donald W. Lemons, Judge

Sylvia Clute for appellant.

James C. Roberts (William F. Etherington;
Mays & Valentine, L.L.P.; Beale, Balfour,
Davidson & Etherington, P.C., on brief),
for appellee.


Eugenie Sterling Trotter (wife) appeals an order of the

trial court denying her claim that John C. Maxwell, Jr. (husband)

violated the trial court's earlier order enforcing the alimony

provision of the parties' property settlement agreement

(agreement). She contends that the trial court erred when it

concluded that the doctrine of collateral estoppel did not

preclude the parties from litigating whether husband had properly

excluded the income he earned from the distribution of his market

share reports from the calculation of his alimony payment in

1988, 1989, 1990, 1991, and 1994. In the alternative, wife

contends that the trial court erred when it concluded that

husband did not violate the alimony provision of the agreement in

[*]Pursuant to Code § 17-116.010 this opinion is not
designated for publication.

these years.  For the reasons that follow, we reverse and remand.

I.

FACTS

The parties married in 1953 and divorced in 1975.  Since the late 1950's, husband has worked as a research analyst in the stock brokerage industry and has built a national reputation as an expert in the food, beverage, and tobacco industries. Throughout his employment as a research analyst, husband has prepared for the investor-clients of his employers reports (stock recommendation reports) that analyze the recent performance of individual companies in the food, beverage, and tobacco industries and recommend whether their stock should be bought, sold, or held.  Since 1960, husband's professional activity has also included preparing reports (market share reports) about recent trends in the food, beverage, and tobacco industries and the current market share of companies competing in these businesses.  Historically, husband has earned income (market share income) from sales of his market share reports to both trade magazines and corporations whom he also consults.[1]

Prior to their divorce, the parties entered into the agreement on April 1, 1975.  The agreement addressed numerous

_____

[1]Throughout the proceedings below, the parties referred to the income earned by husband from his market share reports as "hard dollar income" because this income was paid directly to husband and was not subject to any contingency.  For the sake of clarity, we will refer to this income as "market share income" because it arose from husband's writing and consulting activities that involved the distribution of his market share reports.

issues between the parties, including the payment of alimony by husband to wife.  The relevant portion of the alimony provision states:

> 6.  ALIMONY
>
> *   *   *   *   *   *   *
>
> Beginning January 1, 1976, Husband agrees to pay to Wife as alimony twenty-eight per cent (28%) of the first Three Hundred Sixty Thousand and 00/100 Dollars ($360,000.00) gross income he may earn from his employment per calendar year.
>
> *   *   *   *   *   *   *
>
> [Husband] agrees not to divert any funds which he might receive from said employment for the purpose of circumventing and/or avoiding payment of alimony, except Husband may defer compensation, provided that such deferred compensation shall be treated as gross income for the purpose of the computation of alimony.

In 1976 and 1977, the trial court ordered, among other things, that husband "continue to pay in a current fashion his alimony obligations to [wife] under the April 1, 1975 Agreement between the parties."

In 1984, wife filed a lawsuit in the Federal District Court for the Southern District of New York (federal court) to enforce the agreement's alimony provision.  Wife contended that husband underpaid her in 1982 by failing to include his market share income in his "gross income . . . from his employment" for the purpose of calculating his alimony obligation.  The federal court

held (1) that the parties intended "gross income . . . from his employment" to mean the income husband earned "as an employee" and (2) that husband violated the agreement in 1982 because his market share income earned while working for Lehman Brothers was from his employment and should have been included in the calculation of his alimony obligation.

In late 1987, husband began his current employment with Wheat First Butcher Singer. Prior to beginning this employment, husband negotiated a contract with Wheat that formally distinguished his "business" of distributing his market share reports from his employment relationship with Wheat. The contract permitted husband to continue preparing and distributing his market share reports to trade magazines and corporations as an "independent contractor" and did not require that husband's market share income flow through Wheat's accounting system. The contract did require husband to make a periodic accounting of his market share income, to terminate any relationship with any client upon Wheat's request, and to "conduct [himself] in such a way that no confusion exists as to the relationship between [husband's business] and Wheat."

After commencing his employment with Wheat, husband exclud[ed] his market share income from his "gross income . . . from his employment" when calculating his alimony payment to wife. In 1992 and 1993, wife received the maximum amount of alimony possible under the agreement so that any exclusion of

husband's market share income from his employment income was not an issue.  However, in 1988, 1989, 1990, 1991, and 1994, husband earned less than $360,000 in salary from Wheat.  His market share income during these years was substantial.  In each of these years, husband excluded his market share income from his alimony calculation and instead paid wife 28% of his salary from Wheat.

In August, 1995, wife filed a motion for judgment and a petition for a rule to show cause to enforce both the alimony provision of the agreement and the trial court's orders from 1976 and 1977.  Wife alleged, among other things, that husband had violated the agreement and the trial court's orders by underpaying her in 1988, 1989, 1990, 1991 and 1994.  She argued that husband committed a breach when he excluded his market share income from the calculation of his alimony obligation.  After a hearing, the trial court concluded that husband had not violated the alimony provision of the agreement.  It first concluded that the federal court's holding that husband's market share income in 1982 was earned by him "as an employee" had no preclusive effect on this case.  It then reasoned that:

> the [market share income] earned by [husband]
> at Wheat is not income earned from his
> employment.  Therefore, [husband's] failure
> to include the Wheat [market share income]
> for the purpose of determining alimony in
> 1988, 1989, 1990, 1991, and 1994 does not
> violate the [alimony provision of the
> agreement].[2]

---

[2]The trial court adjudicated numerous other issues litigated by the parties that are not the subject of this appeal.

II.

PRECLUSIVE EFFECT OF THE FEDERAL COURT'S DECISION

Wife contends that the trial court erred when it concluded that the federal court's decision did not control the outcome of this case. Specifically, she argues that the federal court's decision that husband violated the agreement in 1982 by excluding his market share income from his employment income while at Lehman Brothers should have collaterally estopped husband from arguing that the exclusion of his market share income from his employment income at Wheat did not violate the agreement. We disagree.

"The doctrine of collateral estoppel precludes the same parties to a prior proceeding from litigating in a subsequent proceeding any issue of fact that was actually litigated and essential to a final judgment in the first proceeding." Glasco v. Ballard, 249 Va. 61, 64, 452 S.E.2d 854, 855 (1995) (citing Bates v. Devers, 214 Va. 667, 671, 202 S.E.2d 917, 921 (1974)). Collateral estoppel applies only if the following requirements are met:

> (1) the parties to the two proceedings must be the same, (2) the issue of fact sought to be litigated must have been actually litigated in the prior proceeding, (3) the issue of fact must have been essential to the prior judgment, and (4) the prior proceeding must have resulted in a valid, final judgment against the party against whom the doctrine is sought to be applied.

Glasco, 249 Va. at 64, 452 S.E.2d at 855 (citing Bates, 214 Va.

at 671, 202 S.E.2d at 921).

We hold that the trial court did not err by holding that the federal court's decision that husband violated the agreement in 1982 had no preclusive effect on the issues here. The factual issue in this case -- whether husband violated the agreement in 1988, 1989, 1990, 1991, and 1994 by excluding his market share income from his employment income at Wheat -- was not actually litigated in the federal proceeding. "The true test of the conclusiveness of a former judgment with respect to particular matters is identity of issues." Graham v. VEPCO, 230 Va. 273, 277, 337 S.E.2d 260, 263 (1985) (citations omitted). "[A]n appropriate test for determining the identity of issues involved in former and subsequent actions is 'whether the same evidence will support both actions.'" Id. (citation omitted). The factual issue resolved by the federal court was distinct from the issue of fact before the trial court in this case because the two cases dealt with husband's relationship with different employers in different years. The evidence regarding husband's employment with Lehman Brothers and his market share income in 1982 did not establish the relationship between his market share income and his income as an employee of Wheat in 1988, 1989, 1990, 1991, and 1994. Likewise, the evidence of husband's employment with Wheat would not have supported his case before the federal court. Because the identical factual issue before the trial court was not actually litigated in the federal proceeding, the trial court

correctly concluded that the federal court's decision that husband violated the agreement in 1982 did not preclude it from deciding whether he violated the agreement in 1988, 1989, 1990, 1991, or 1994.

## III.

## VIOLATION OF THE AGREEMENT

Wife argues that, even if the federal court's decision did not bar litigation regarding the husband's employment at Wheat, the trial court erred when it concluded that husband's alimony payments in 1988, 1989, 1990, 1991, and 1994 did not violate the agreement. She argues that husband violated the agreement when he calculated his alimony payment in these years without including his market share income in his "gross income he [earned] from his employment." She asserts that the trial court erred when it concluded that husband's market share income was not income earned from his employment with Wheat. We agree.

In reaching its conclusion that husband's market share income was not earned as an employee of Wheat, the trial court considered husband's duties as a research analyst, Wheat's view of husband's market share activities and income, and the actual financial cost and benefit to Wheat arising from husband's production of his market share reports. The trial court found that husband's income from his market share reports was not income from his employment because his market share reports do not contain investment advice, are not within the scope of his

-8-

duties as a research analyst, and are of little interest to Wheat's clients. It also reasoned that Wheat views husband's distribution of his market share reports as an activity distinct from his employment and that Wheat neither pays husband to produce his market share reports nor receives any income from their distribution.

Under the agreement, husband is required to pay wife 28% of the first $360,000 "gross income he may earn from his employment per calendar year." As the trial court noted, neither party contests the federal court's conclusion that they intended to limit the reach of this clause to the income that husband earns "as an employee." Logically, employment includes both income paid directly to an employee by his or her employer and income derived from other sources that compensates work within the scope of his or her employment. An employee's activity is generally within the scope of his or her employment if

> (1) it was expressly or impliedly directed by the employer, or is naturally incident to the business, and (2) it was performed . . . with the intent to further the employer's interest, or from some impulse or emotion that was the natural consequence of an attempt to do the employer's business, "and did not arise wholly from some external, independent, and personal motive on the part of the [employee] to do the act upon his [or her] own account."

Kensington Assoc. v. West, 234 Va. 430, 432, 362 S.E.2d 900, 901 (1987) (citation omitted).

Whether a breach of contract has occurred is a mixed

-9-

question of law and fact.

> It is a question of law whether particular
> facts constitute a performance or breach of a
> contract; whether such facts have occurred
> is, on conflicting evidence, a question of
> fact.

17A C.J.S. Contracts § 630(a) (1963).  Thus, the trial court's
findings regarding husband's relationship with Wheat and the
distribution of his market share reports are questions of fact,
while the issue of whether husband breached the agreement by
excluding his market share income from his employment income for
the purpose of calculating his annual alimony payment is a
question of law.

We hold that the trial court erred when it concluded that
husband did not violate the agreement in 1988, 1989, 1990, 1991,
and 1994 when he calculated his alimony payment without including
his market share income.  We hold that husband's market share
income was part of his "gross income he [earned] from his
employment" in these years because husband earned this income
from an activity that was within the scope of his employment as a
research analyst at Wheat.  Husband's work preparing and
distributing his market share reports was incidental to his
employment as a research analyst, performed during his hours of
employment at Wheat, and partially intended to benefit Wheat's
business.

First, husband's work preparing and distributing his market
share reports was a natural incident to his employment as

research analyst with Wheat.  This activity was incidental to husband's employment because it established his national reputation as an expert analyst, which consequently assisted him in attracting both brokerage and underwriting business to Wheat.

The record established that husband built and then maintained his national reputation as an expert in the food, beverage, and tobacco industries in part through writing his market share reports and distributing them first to trade magazines and later to corporations seeking his counsel.  Hundley Davenport, an officer with Wheat, testified that husband's market share reports "establish[ed] his overall presence in the industry as being an authority."  Husband's reputation in the industry was important to his duties as a research analyst with Wheat.  Mr. Davenport testified that Wheat hired husband in 1987 because it expected his reputation as an expert in the food, beverage, and tobacco industries to help build Wheat's research department.  Husband likewise testified that his expert reputation was vital to his duty as an analyst to convince institutional investors to use Wheat as their stock broker.  He testified:

> I'm sort of a traveling salesman, whether
> with Wheat or Morgan.  I've got to go out and
> sell my products, brains or whatever you want
> to call it to the various institutional
> clients which we were trying to get business.

The maintenance of husband's reputation through the distribution of his market share reports was incidental to his employment also because it enhanced the stature of Wheat's underwriting business

with prospective corporate clients.  Mr. Davenport testified that

> the key in [corporate] financing is it is
> important that you have an analyst that
> follows a particular industry and company.
> [Husband] has been an institutional all
> American analyst 15, 20 times in various
> groups, and it is certainly known by these
> industry participants that he is an expert in
> these areas . . . .

The incidental relationship between husband's market share reports and his employment with Wheat was also indicated by the manner in which Wheat and husband agreed to package the market share reports.  Despite Wheat's and husband's initial agreement that husband conduct the "business" of distributing his market share reports in a manner that avoided "confusion" regarding husband's independence from Wheat in this capacity, both Wheat and husband agreed to label his market share reports so that recipients would believe that they were produced by husband in the course of his employment with Wheat.  The market share reports contained the names and telephone numbers of Wheat's research staff and also bore Wheat's logo, which Davenport testified would lead both husband's clients and Wheat's institutional clients who received them "to think that Wheat is associated with the document."  In addition, many of the reports contained the following disclaimer clause:  "While the information herein has been obtained from sources we believe to be reliable, Wheat First Securities does not guarantee its accuracy or completeness."  Although the subscription fees for

the market reports were paid directly to husband rather than to Wheat under the terms of his employment contract, the costs of preparing, printing, and disseminating the report were borne by Wheat. In addition, husband prepared the report during the hours of his employment at Wheat.

Husband's work distributing his market share reports was at least partially motivated by a desire to benefit Wheat's business. The evidence in the record established that husband's effort to prepare and distribute his market share reports was prompted by a synergy of personal benefit to himself and commercial gain to Wheat: as husband built his reputation as an expert in the food, beverage, and tobacco industries, he not only profited from his increased market share income, he was also able to conduct more brokerage business for Wheat. At the hearing, husband testified that, as a research analyst employed by Wheat, he is essentially a "salesman" and that his ultimate purpose is to "cause" stock transactions, "either buy or sell," to occur. Although husband's market share reports do not themselves include investment advice, the evidence in the record indicates that husband intended their distribution to enhance his reputation as an analyst and consequently to increase his ability to "cause" more transactions, and thus profits, for Wheat's brokerage business. Husband's intent to benefit his employer's business through the production of his market share reports was also indicated by his apparent acquiescence to Wheat's requests for

permission to send these reports to its institutional clients.

Although the employment contract stated that in his capacity of producing the market share reports the husband was an independent contractor, that characterization is not dispositive of whether the income the husband earned was earned "as an employee." The employment contract stated that the husband was required (1) to report to Wheat the revenue he earned from the reports, (2) to submit an audit, and (3) to provide a subscriber list. Most significantly, husband prepared the report during his working hours at Wheat. This involvement and oversight by Wheat represents significant control over the husband's production of the market share reports. Accordingly, the statement in the contract that the husbnad was an independent contractor is not dispositive of the character of the income.

Because husband's market share income was earned from an activity within the scope of his employment, we conclude that husband violated the alimony provision of the agreement in 1988, 1989, 1990, 1991, and 1994 when he calculated his alimony payment to wife without including this income as part of the "gross income he [earned] from his employment."

For the foregoing reasons, we reverse the judgment of the trial court denying wife's claim that husband violated its order enforcing the alimony provision of the agreement and remand for proceedings consistent with this opinion.

<u>Reversed and remanded</u>.

-14-